# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3949

_____

| | | |
|---|---|---|
| Amerind Risk Management Corporation, | * * * | |
| Appellant, | * * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of North Dakota. |
| Myrna Malaterre; Carol Belgarde; Lonnie Thompson, | * * * | |
| Appellees. | * | |

_____

Submitted: October 22, 2009
Filed: February 15, 2011

_____

Before BYE, BEAM, and SHEPHERD, Circuit Judges.

_____

BEAM, Circuit Judge.

Amerind Risk Management Corporation (Amerind) is a federally chartered corporation that assumed the rights and obligations of its tribally chartered predecessor, also named Amerind Risk Management Corporation (ARMC). Amerind appeals the federal district court's adverse grant of summary judgment in this declaratory judgment action. Amerind sought a determination in federal district court that the Turtle Mountain Tribal Court (Tribal Court) lacked jurisdiction over tort litigation between Amerind and three enrolled members of the Turtle Mountain Band of Chippewa Indians (Tribe), and requested an order enjoining the plaintiffs from

proceeding in the Tribal Court. The district court held that, although Amerind was a nonmember of the Tribe, the Tribal Court had jurisdiction over the tort litigation based on ARMC's contractual relationship with the Turtle Mountain Housing Authority (TMHA), an entity of the Tribe.

We hold that the Tribal Court does not have jurisdiction over the plaintiffs' direct suit against Amerind because Amerind is entitled to tribal immunity and the plaintiffs have failed to meet their burden of showing that Amerind waived such immunity. Accordingly, we reverse the district court and remand with directions to enjoin the plaintiffs from proceeding against Amerind in Tribal Court.

## I.    BACKGROUND

In 1986, at the encouragement of the United States Department of Housing and Urban Development, ARMC was incorporated under the laws of the Red Lake Band of Chippewa Indians as a self-insurance risk pool for Indian Housing Authorities and Indian tribes. TMHA joined the ARMC risk pool and, on December 28, 2001, ARMC issued TMHA a "Certificate of Coverage" and a "Scope of Coverage" document outlining TMHA's property damage and personal injury coverage from January 1, 2002, through December 31, 2002.

On October 19, 2002, a fire destroyed a house on the Turtle Mountain Indian Reservation being leased from TMHA, killing two houseguests and seriously injuring a third. Three enrolled members of the Tribe–Myrna Malaterre and Carol Belgarde, mothers of the deceased houseguests; and Lonnie Thompson, the injured houseguest (plaintiffs)[1]–brought a wrongful death and personal injury action against TMHA in the Tribal Court. The complaint was amended on September 5, 2003, to include ARMC as a defendant. ARMC filed a motion to dismiss, challenging the Tribal Court's jurisdiction on the basis of tribal sovereign immunity. While the case was

---

[1]Lonnie Thompson was added as a plaintiff after the lawsuit was filed.

pending in Tribal Court, the Department of the Interior issued a federal corporate charter incorporating Amerind pursuant to 25 U.S.C. § 477.[2] The charter was effective upon ratification by the Charter Tribes–the Red Lake Band of Chippewa Indians, the Confederated Salish and Kootenai Tribes of the Flathead Reservation, and the Pueblo of Santa Ana. By April 15, 2004, all three Charter Tribes passed resolutions ratifying Amerind's federal charter. Notably, the federal charter gave Amerind the power "[t]o acquire the rights and assets and assume the obligations and liabilities of [ARMC]."

On July 1, 2004, the plaintiffs filed a declaratory judgment action in federal district court seeking a determination that the ARMC self-insurance policy covered their claims. Amerind filed a motion to dismiss, asserting that the plaintiffs failed to exhaust their tribal remedies and, alternatively, that Amerind was entitled to tribal sovereign immunity as a § 477 corporation. The federal district court dismissed the case without prejudice, holding that pursuant to the tribal exhaustion doctrine, the Tribal Court should be given the first opportunity to address the factual and legal issues presented in the case, including the tribal sovereign immunity issue. Malaterre

---

[2]25 U.S.C. § 477 provides:

The Secretary of the Interior may, upon petition by any tribe, issue a charter of incorporation to such tribe: *Provided*, That such charter shall not become operative until ratified by the governing body of such tribe. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding twenty-five years any trust or restricted lands included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

v. Amerind Risk Mgmt., 373 F. Supp. 2d 980, 982 n.3, 985-86 (D. N.D. 2005) (Amerind I). The court noted that "[i]f needed, the parties can return to this forum for any further litigation." Id. at 986. Thus, the parties returned to the Tribal Court.

On October 20, 2005, the plaintiffs filed a stipulation to dismiss TMHA with prejudice in the Tribal Court. The Tribal Court granted the motion, leaving Amerind as the sole defendant in the case. Amerind then filed a motion to dismiss, asserting *inter alia* that it was entitled to tribal sovereign immunity as a § 477 corporation, and that the plaintiffs' action could not proceed directly against Amerind because they were not parties to ARMC's contract with TMHA. The Tribal Court denied Amerind's motion to dismiss, holding that Amerind was not entitled to sovereign immunity because it "does not stand in the same position as TMHA or the [Tribe]." The court also held that the plaintiffs could proceed directly against Amerind because, under Turtle Mountain tribal law, claimants may proceed directly against an insurer if the insured was required by federal law to obtain insurance designed to protect the public against losses. The Tribal Court's decision did not address Amerind's specific contention that it was entitled to sovereign immunity in its own right as a § 477 corporation. Amerind appealed to the Turtle Mountain Tribal Court of Appeals (Tribal Court of Appeals).

Before the Tribal Court of Appeals, Amerind again asserted that it was entitled to sovereign immunity as a § 477 corporation, and that the plaintiffs were prohibited from maintaining a direct suit against Amerind. The Tribal Court of Appeals affirmed the Tribal Court's denial of Amerind's motion to dismiss, reasoning that Amerind was not entitled to share in TMHA's sovereign immunity, and that tribal law permitted the plaintiffs' direct suit. Like the Tribal Court, the Tribal Court of Appeals failed to specifically discuss Amerind's status as a § 477 corporation and whether Amerind was entitled to sovereign immunity in its own right.

-4-

On September 4, 2007, Amerind commenced a declaratory judgment action in federal district court, seeking a determination that the Tribal Court exceeded its jurisdiction by exercising authority over Amerind, a nonmember of the Tribe, under Montana v. United States, 450 U.S. 544, 565 (1981). Amerind also sought to enjoin the plaintiffs[3] from pursuing their tort action directly against Amerind in Tribal Court. Amerind filed a motion for summary judgment on June 24, 2008. Inexplicably, Amerind failed to raise the tribal immunity issue in either its complaint or in its motion for summary judgment. Nevertheless, the plaintiffs' response to Amerind's motion for summary judgment outlined provisions in the Scope of Coverage agreement that allegedly waived ARMC's, and by extension Amerind's, sovereign immunity. The plaintiffs' response also rhetorically inquired, "Why does AMERIND argue that it is entitled to sovereign immunity when the policy clearly states otherwise?" and asserted that "neither AMERIND nor TMHA is entitled to raise sovereign immunity as a defense to the [plaintiffs'] claims."

The district court denied Amerind's motion for summary judgment, concluding that under Montana, the Tribal Court had jurisdiction over Amerind because ARMC entered into a consensual contractual relationship with TMHA to insure TMHA against personal injury and property loss. Amerind Risk Mgmt. Corp. v. Malaterre, 585 F. Supp. 2d 1121, 1130 (D. N.D. 2008) (Amerind II). The court also incorporated the Tribal Court of Appeals' decision by reference and *sua sponte* granted summary judgment in favor of the plaintiffs, directing the parties to litigate the plaintiffs' suit in the Tribal Court. Id. The district court did not address whether the doctrine of tribal sovereign immunity affected the Tribal Court's jurisdiction–an issue raised in Amerind I, discussed in the Tribal Court of Appeals' incorporated decision, and addressed in the plaintiffs' response to Amerind's motion for summary judgment.

---

[3]In this declaratory judgment action, Malaterre, Belgarde, and Thompson are technically "defendants," but they are "plaintiffs" in the underlying Tribal Court action, and we refer to them as "plaintiffs" here to avoid confusion.

Amerind appeals, asserting in part that the Tribal Court lacked jurisdiction over Amerind under Montana. Amerind did not raise the tribal immunity issue in its appellate brief, and we directed the parties to address whether tribal immunity barred the plaintiffs' action against Amerind in the Tribal Court. See Taylor v. Alabama Intertribal Council Title IV J.T.P.A., 261 F.3d 1032, 1034 (11th Cir. 2001) (per curiam) (We may "*sua sponte* conduct an inquiry into whether a party enjoys Indian sovereign immunity, as this consideration determines whether a court has jurisdiction to hear an action.").

## II.   DISCUSSION

We have held that tribal sovereign immunity is a threshold jurisdictional question.[4] Hagen v. Sisseton-Wahpeton Cmty. Coll., 205 F.3d 1040, 1044 (8th Cir. 2000). "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers."[5] Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978). Thus, "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998). "A waiver of sovereign immunity may not be implied, but must be unequivocally expressed by either the Tribe or Congress." Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1244 (8th Cir. 1995).

---

[4]Amerind concedes it voluntarily waived its tribal immunity in federal court by filing this declaratory judgment action, so our jurisdiction is not in dispute. See Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1244-45 (8th Cir. 1995). Therefore, our question on appeal is whether tribal sovereign immunity precludes the Tribal Court from exercising jurisdiction over the plaintiffs' underlying tort action.

[5]Amerind is a § 477 corporation that is jointly owned by the Charter Tribes, not the Turtle Mountain Band of Chippewa Indians. "The power to subject other sovereigns to suit in tribal court [is] . . . not a part of the tribes' inherent sovereignty." Montana v. Gilham, 133 F.3d 1133, 1138 (9th Cir. 1998).

To determine whether Amerind is immune from the plaintiffs' suit in Tribal Court, we must first determine whether Amerind is entitled to sovereign immunity. While Amerind is not itself a tribe, "[i]t is . . . undisputed that a tribe's sovereign immunity may extend to tribal agencies." Hagen, 205 F.3d at 1043. As discussed above, Amerind was incorporated by three Charter Tribes and issued a federal charter under 25 U.S.C. § 477. Several courts have recently recognized that § 477 corporations are entitled to tribal sovereign immunity. See Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc., 585 F.3d 917, 920-21 (6th Cir. 2009); Bales v. Chickasaw Nation Indus., 606 F. Supp. 2d 1299, 1304 (D. N.M. 2009); Sanchez v. Santa Ana Golf Club, Inc., 104 P.3d 548, 551 (N.M. Ct. App. 2004). As the Sixth Circuit emphasized in Memphis Biofuels, "the language of [§ 477] itself–by calling the entity an 'incorporated tribe'–suggests that the entity is an arm of the tribe." 585 F.3d at 921.

We also note that Amerind is not an ordinary insurance company. Indeed, Amerind's purpose is to administer a *self-insurance* risk pool for Indian Housing Authorities and Indian tribes. See Self-Insurance Plans Under the Indian Housing Block Grant Program, 71 Fed. Reg. 11464, 11464 (proposed Mar. 7, 2006) ("AMERIND continues to administer the approved self-insurance plan for properties funded under NAHASDA, pursuant to 24 CFR 1000.138."). Because Amerind is a § 477 corporation that administers a tribal self-insurance risk pool, we hold that Amerind "serves as an arm of the [Charter Tribes] and not as a mere business and is thus entitled to tribal sovereign immunity." Hagen, 205 F.3d at 1043.

Given that Amerind is entitled to tribal immunity, our next question is whether Amerind's immunity has been waived.[6] The plaintiffs bear the burden of proving that

---

[6]The plaintiffs assert that we may not consider Amerind's federal corporate charter because it was not introduced into the record in Amerind II. We note that citations to and quotations from Amerind's federal charter appear in the exhibits attached to the plaintiffs' response to Amerind's motion for summary judgment in

either Congress or Amerind has expressly and unequivocally waived tribal sovereign immunity.  Garcia v. Akwesasne Hous. Auth., 268 F.3d 76, 84 (2d Cir. 2001); Welch v. United States, 409 F.3d 646, 651 (4th Cir. 2005).  The plaintiffs do not argue that Congress waived Amerind's sovereign immunity, so our focus is solely on whether Amerind waived its sovereign immunity.

The plaintiffs assert that Amerind waived its sovereign immunity by failing to raise the issue before the district court in Amerind II.  However, our court has held that sovereign immunity is a "threshold jurisdictional matter" and a "jurisdictional prerequisite."  Hagen, 205 F.3d at 1044 (quotations omitted).  Therefore, tribal sovereign immunity may be raised for the first time on appeal, id., or raised *sua sponte* by the court.  Taylor, 261 F.3d at 1034.  We also note that the tribal sovereign immunity issue is not a newcomer to the litigation between these parties.  Indeed, the issue was raised in Amerind I, in the Tribal Court, in the Tribal Court of Appeals, and it was discussed in the plaintiffs' response to Amerind's motion for summary judgment in Amerind II.  Accordingly, we hold that Amerind did not waive its tribal immunity by failing to raise the issue in Amerind II, and we properly raised the issue *sua sponte*.

---

Amerind II.  Moreover, the charter, which was issued by the Department of the Interior, was introduced into evidence in Amerind I and in the Tribal Court. Therefore, our consideration of the charter is appropriate. See Omaha Tribe of Neb. v. Miller, 311 F. Supp. 2d 816, 819 n.3 (S.D. Iowa 2004) (taking judicial notice of tribe's corporate charter as a public record); Biomedical Patent Mgmt. Corp. v. Cal., Dep't of Health Servs., 505 F.3d 1328, 1331 n.1 (Fed. Cir. 2007) (taking judicial notice of court filings from previous litigation between the parties as public records); Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of the Miss. in Iowa, 609 F.3d 927, 937 (8th Cir. 2010) ("In analyzing the jurisdictional issue we rely on the record developed in the tribal courts . . . ."), cert. denied, 2011 WL 134297 (U.S. Jan. 18, 2011).  Because it is undisputed that Amerind is a § 477 corporation that administers a self-insurance risk pool, we only consider the charter's specific provisions to determine whether Amerind waived its sovereign immunity. Given that the plaintiffs bear the burden of proving waiver, their attempt to exclude the charter from our discussion is counterintuitive.

The plaintiffs' second waiver argument is more complex. The plaintiffs begin their argument by pointing out that Amerind's federal charter authorizes Amerind to "assume the obligations and liabilities of [ARMC]." The plaintiffs then assume, without citing any supporting authority, that this provision constitutes an express waiver of Amerind's sovereign immunity so long as ARMC was amenable to the plaintiffs' pending suit in Tribal Court. Finally, the plaintiffs point to provisions in the contract between ARMC and TMHA that purportedly waive ARMC's, and by extension Amerind's, tribal immunity. Because we hold that the general assumption of ARMC's obligations and liabilities in Amerind's federal charter does not constitute an express waiver of Amerind's sovereign immunity, we need not address the plaintiffs' arguments regarding ARMC's purported waiver of its sovereign immunity.[7]

To determine whether Amerind waived its sovereign immunity when it expressly assumed ARMC's "obligations and liabilities," we find the Eleventh Circuit's decision in Asociacion De Empleados Del Area Canalera v. Panama Canal Commission, 453 F.3d 1309, 1316 (11th Cir. 2006) instructive. There, plaintiffs sued the Panama Canal Commission (PCC), a wholly-owned United States corporation, for unpaid work benefits. Id. at 1311-12. While the suit was pending, Congress terminated the PCC and, through 22 U.S.C. § 3712(e)(2), directed the General Service Administration (GSA) to "make payments of any outstanding liabilities of the PCC."

---

[7]A sovereign entity does not automatically waive its sovereign immunity through the mere act of succeeding a corporation that is either not entitled to sovereign immunity or that has waived such immunity. See Asociacion De Empleados Del Area Canalera v. Panama Canal Comm'n, 453 F.3d 1309, 1315-16 (11th Cir. 2006); Maysonet-Robles v. Cabrero, 323 F.3d 43, 49-50 (1st Cir. 2003); Kroll v. Bd. of Trs. of the Univ. of Ill., 934 F.2d 904, 909 (7th Cir. 1991). In other words, a predecessor corporation's amenability to a pending suit is irrelevant unless the sovereign successor's immunity has been expressly and unequivocally waived. Asociacion De Empleados, 453 F.3d at 1316; Maysonet-Robles, 323 F.3d at 50; Kroll, 934 F.2d at 909. Thus, if Amerind did not expressly waive its sovereign immunity, we need not determine whether ARMC was immune from suit.

Id. at 1312 (internal quotation omitted). The plaintiffs argued that by directing the GSA to pay the PCC's "outstanding liabilities," Congress unequivocally waived the GSA's sovereign immunity as to the pending suit. The Eleventh Circuit disagreed, holding that "to accept [plaintiffs'] position would be to imply a waiver of immunity, which we will not do." Id. at 1315.

Precedent from our circuit also supports the conclusion that Amerind's general assumption of ARMC's "obligations and liabilities" was, at most, an implied waiver of sovereign immunity. In American Indian Agricultural Credit Consortium, Inc. v. Standing Rock Sioux Tribe, 780 F.2d 1374 (8th Cir. 1985), a creditor sued the Standing Rock Sioux Tribe after the tribe defaulted on a promissory note. The promissory note stated that, upon the tribe's default, the creditor was entitled to (1) "rights and remedies provided by law," and (2) reimbursement of attorney fees incurred in collection efforts. Id. at 1376. The note also stated that such rights and obligations would be subject to the law of the District of Columbia. Id. We rejected the creditor's argument that the promissory note constituted an express waiver of the Tribe's sovereign immunity. Specifically, we emphasized that through the note, the Tribe did not "explicitly consent to submit any dispute over repayment on the note to a particular forum, or to be bound by its judgment." Id. at 1380. Accordingly, we held that "[t]o derive an express waiver of sovereign immunity" from the promissory note "simply asks too much." Id. at 1380-81.

Like the promissory note in Standing Rock, and like the federal statute in Asociacion De Empleados, Amerind's federal charter does not state that Amerind, in assuming ARMC's obligations and liabilities, consents to submit to a particular forum, or consents to be bound by its judgment. Cf. Rosebud Sioux Tribe v. Val-U Const. Co. of S.D., Inc., 50 F.3d 560, 563 (8th Cir. 1995) (holding that tribe waived its immunity as to contract claims by expressly designating an arbitral forum to settle contract disputes and agreeing to arbitration rules that explicitly provided for judicial enforcement of arbitration awards). In fact, Article 8, Section 8.18 of Amerind's charter provides that Amerind may "sue and be sued in the Corporation's name in

courts of competent jurisdiction within the United States, *but only to the extent provided in and subject to the limitations stated in Article 16 of this Charter*." (emphasis added).  Article 16.4 provides:

> *Any waiver* [of tribal immunity] by the Corporation . . . *shall be in the form of a resolution duly adopted by the Board of Directors*, which resolution shall not require the approval of the Charter Tribes or the Secretary of the Interior.  *The resolution shall* identify the party or parties for whose benefit the waiver is granted, the transaction or transactions and the claims or classes of claim for which the waiver is granted, the property of the Corporation which may be subject to execution to satisfy any judgment which may be entered in the claim, and shall identify the court or courts in which suit against the Corporation may be brought.  Any waiver shall be limited to claims arising from the acts or omissions of the Corporation, its Directors, officers, employees or agents, and shall be construed only to effect the property and Income of the Corporation.

(emphasis added).  The plaintiffs have provided no evidence that Amerind's Board of Directors ever adopted a resolution waiving Amerind's immunity as to the plaintiffs' pending suit, and absent such a resolution, we cannot say that Amerind unequivocally waived its sovereign immunity when it generally assumed ARMC's "obligations and liabilities."[8]  See Memphis Biofuels, 585 F.3d at 921-22 (where federal charter required board resolution to waive tribal immunity, immunity was not waived without such a resolution even though the corporation's contract with the plaintiff expressly waived all immunities).

_____

[8]We disagree with the dissent's contention that we should remand to the district court for the plaintiffs to conduct further discovery.  In Amerind I, Amerind's motion to dismiss asserted that Amerind's Board of Directors had not adopted a resolution to waive Amerind's tribal immunity and the plaintiffs were permitted discovery.  Later, the parties litigated the tribal immunity issue in both the Tribal Court and the Tribal Court of Appeals.  Now, more than six years after Amerind raised the tribal immunity issue in Amerind I, the plaintiffs can point to no evidence that Amerind's Board of Directors ever passed a resolution to waive Amerind's sovereign immunity as to the plaintiffs' claims.  Under these circumstances, we find that remanding this case for another round of discovery is neither appropriate nor necessary.

Thus, we hold that Amerind is entitled to sovereign immunity and that the plaintiffs have failed to show that Amerind expressly waived such immunity as to the underlying personal injury/wrongful death action in this case. Given that Amerind did not waive its sovereign immunity, we need not decide whether ARMC was amenable to the plaintiffs' suit.[9] Accordingly, the Tribal Court does not have jurisdiction over

[9]Although we need not decide whether ARMC was amenable to suit, we disagree with the dissent's assertion that ARMC waived its immunity through the Scope of Coverage agreement's arbitration provision. The provision in question is housed under the heading "Non-Binding Arbitration" and provides: "If [TMHA] and [ARMC] do not agree whether coverage is provided by the Scope of Coverage document, then either party *may* make a written demand for arbitration." (emphasis added). This provision is readily distinguishable from the arbitration provisions that operated as express waivers of tribal immunity in C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 532 U.S. 411 (2001), and Rosebud, 50 F.3d 560 (8th Cir. 1995). Unlike the provision in the present case, the arbitration provisions in those cases expressly required *binding* arbitration and *judicial enforcement* of arbitration awards. C & L, 532 U.S. at 414-15; Rosebud, 50 F.3d at 562-63. Also, unlike the plaintiffs in the present case, the plaintiffs in both C & L and Rosebud were parties to the contracts containing the arbitration provisions at issue. C & L, 532 U.S. at 414; Rosebud, 50 F.3d at 563. And finally, the Rosebud court held that the binding arbitration provision in that case waived tribal immunity as to contract claims, but not as to tort claims. Rosebud, 50 F.3d at 563. It is a mystery, then, how the non-binding arbitration provision in the agreement between ARMC and TMHA waived ARMC's tribal immunity as to the plaintiffs' underlying tort action.

The dissent also places undue emphasis on the Scope of Coverage document's conformity provision, which provides that "[i]f any provision of this policy conflicts with the tribal laws of [the Tribe], this policy is amended to conform to those laws." In order to drum up a conflict between the policy and Turtle Mountain tribal law, which permits direct suits against insurers under certain circumstances, the dissent relies on a remote provision housed in the policy's "Tribal Housing Officials Liability Coverage" section. The provision provides: "No action shall be taken against the Insurer unless, as a condition precedent thereto, . . . the Insureds' obligation to pay

the plaintiffs' direct suit against Amerind.

## III.  CONCLUSION

We reverse the district court and remand with instructions to enjoin the plaintiffs from proceeding against Amerind in the Tribal Court.

BEAM, Circuit Judge, concurring specially.

In <u>Nevada v. Hicks</u>, 533 U.S. 353, 373-74 (2001), the Court rejected the notion that qualified immunity claims should be considered in reviewing tribal court jurisdiction because such immunity defenses are not jurisdictional.  Although <u>Hicks</u> did not specifically discuss sovereign immunity, which has been frequently described as a threshold jurisdictional issue in our circuit, the Tenth Circuit concluded that <u>Hicks</u> stands for the proposition that courts should consider tribal court jurisdiction under <u>Montana</u> "before reaching the sovereign immunity question."  <u>MacArthur v. San Juan County</u>, 309 F.3d 1216, 1227 (10th Cir. 2002).  In the event that the Tenth Circuit's sequencing of these issues is correct, I would also reverse the district court's conclusion that the Tribal Court had jurisdiction over the plaintiffs' underlying tort action under <u>Montana</u>.

"We review a district court's grant of summary judgment de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party."  <u>Copeland v. Locke</u>, 613 F.3d 875, 879 (8th Cir. 2010) (quotation omitted).

---

shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant, and the Insurer."  While this provision of the policy arguably conflicts with Turtle Mountain tribal law, a closer reading of the policy reveals that this section defines "Insurer" as "United States Fire Insurance Company."  It is not clear how this provision, which applies to an entirely different insurer, could possibly operate as an express waiver of ARMC's immunity.

"The extent of tribal court subject matter jurisdiction over claims against nonmembers of the Tribe is a question of federal law which we review de novo." Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of the Miss. in Iowa, 609 F.3d 927, 934 (8th Cir. 2010), cert. denied, 2011 WL 134297 (U.S. Jan. 18, 2011).

Under Montana and its progeny, a tribal court's civil jurisdiction generally does not extend to the activities of nonmembers of the tribe. Montana, 450 U.S. at 565; Strate v. A-1 Contractors, 520 U.S. 438, 453 (1997); see Attorney's Process, 609 F.3d at 936 ("Montana's analytic framework now sets the outer limits of tribal civil jurisdiction–both regulatory and adjudicatory–over nonmember activities on tribal and nonmember land."). The plaintiffs concede that Amerind is a nonmember of the Tribe,[10] but they contend that ARMC, and by extension Amerind, is subject to the Tribal Court's jurisdiction because ARMC entered into a consensual agreement with TMHA, an entity of the Tribe. This argument is premised on Montana's "consensual relationship" exception, which provides that a tribal court retains jurisdiction over "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." Montana, 450 U.S. at 565; Strate, 520 U.S. at 456-57. This is a limited exception, however. The tribe retains jurisdiction only over suits which "have a nexus to the consensual relationship itself." Atkinson Trading Co. v. Shirley, 532 U.S. 645, 656 (2001). In other words, "[a] nonmember's consensual relationship in one area . . . does not trigger tribal civil authority in another–it is not in for a penny, in for a Pound." Id. (internal quotation omitted).

Here, the district court agreed with the plaintiffs and found that their direct suit against Amerind fell under Montana's consensual relationship exception. The court emphasized that the dispute between Amerind and the plaintiffs was "distinctively

_____

[10]Amerind is jointly owned by three Charter Tribes, none of which is the Turtle Mountain Band of Chippewa Indians (Tribe).

tribal in nature," Amerind II, 585 F. Supp. 2d at 1129, and that the contract between ARMC and TMHA was "directly at the heart of this dispute." Id. I disagree.

While the scope of tribal courts' jurisdiction over nonmembers is admittedly "ill-defined," Hicks, 533 U.S. at 376 (Souter, J., concurring), the following cases are instructive in applying Montana to the facts presented here. In Strate, Gisela Fredericks was seriously injured when her automobile collided with a gravel truck driven by Lyle Stockert and owned by A-1 Contractors (A-1), Stockert's employer. 520 U.S. at 443. The accident occurred on a North Dakota state highway that ran through the Fort Berthold Indian Reservation, home of the Three Affiliated Tribes. Id. at 442-43. Although Fredericks, Stockert, and A-1 were all nonmembers of the Tribes, Fredericks filed suit in tribal court under Montana's consensual relationship exception. Id. at 443. Fredericks argued that the tribal court had jurisdiction over the suit because A-1 was working on the reservation pursuant to a subcontract with a corporation wholly owned by the Tribes. The Supreme Court rejected this argument, reasoning that "[a]lthough A-1 was engaged in subcontract work on the Fort Berthold Reservation, and therefore had a 'consensual relationship' with the Tribes, Gisela Fredericks was not a party to the subcontract, and the [T]ribes were strangers to the accident." Id. at 457 (second alteration in original) (internal quotation omitted) .

In Nord v. Kelly, 520 F.3d 848 (8th Cir. 2008), we considered a case factually similar to Strate. There, Chad Nord, a non-Indian, was driving a semi-truck owned by Nord Trucking when he collided with an automobile driven by Donald Kelly, a member of the Red Lake Band of Chippewa Indians. Id. at 851. The accident occurred on a Minnesota state highway that ran through the Red Lake Indian Reservation. Id. Kelly sued Nord in tribal court under Montana's consensual relationship exception, emphasizing that Nord Trucking had a consensual commercial relationship with the Red Lake Band to haul and remove timber from the reservation. We disagreed, concluding that "the accident gave rise to a simple tort claim between strangers, *not a dispute arising out of the commercial relationship.*" Id. at 856

-15-

(emphasis added). Importantly, we also determined that whether Nord was driving in connection with Nord Trucking's contract with the Red Lake Band at the time of the accident was immaterial because "the dispute merely involves the tortious conduct of a run-of-the-mill highway accident between strangers, and no amount of discovery can alter the nature of that claim." Id. (internal quotation omitted). Note that in Nord, unlike in Strate, the plaintiff was a member of the tribe whose court was attempting to assert jurisdiction.

In the present case, the plaintiffs initially filed suit against TMHA in the Tribal Court, asserting that the TMHA negligently maintained a house it leased to individuals on the Turtle Mountain Indian Reservation. The plaintiffs amended their complaint to include ARMC as a defendant because ARMC was TMHA's insurer. Then, they dismissed TMHA with prejudice, leaving Amerind, ARMC's successor, as the sole defendant in the suit. Thus, what began as a distinctively tribal personal injury/wrongful death suit between the plaintiffs and TMHA became a suit between the plaintiffs and Amerind–i.e., a suit between "strangers." As in Strate and Nord, the plaintiffs are not parties to ARMC's contract with TMHA. Indeed, the Scope of Coverage agreement expressly states that "[t]his . . . document is a contract between you and us," defining "you" as TMHA and "us" as ARMC. The agreement also expressly excludes "[t]enants and participants of mutual help home ownership programs" from the definition of "Covered Person."

I disagree with the district court's determination that "[t]he contract between [ARMC] and [TMHA] is directly at the heart of this dispute." Amerind II, 585 F. Supp. 2d at 1129. In reality, it is TMHA's alleged negligence that is "directly at the heart" of the plaintiffs' underlying personal injury and wrongful death claims. The district court itself recognized that, even under Turtle Mountain tribal law, the secondary question of whether the ARMC policy covers the plaintiffs' losses does not arise unless and until "the plaintiffs . . . can establish that [TMHA] was negligent and that such negligence was the proximate cause of the injuries sustained by the plaintiffs." Id. at 1130.

-16-

While ARMC had a consensual relationship with TMHA, it was TMHA's alleged negligence, not ARMC's contractual relationship with TMHA, that gave rise to the plaintiffs' personal injury/wrongful death suit. The Supreme Court has cautioned against broadly applying <u>Montana</u>'s exceptions and made it clear that when it comes to a nonmember's consensual relationship with a tribe or its members, it is not "in for a penny, in for a Pound." <u>Atkinson</u>, 532 U.S. at 656 (quotation omitted). Accordingly, I would find that the Tribal Court does not have jurisdiction over the plaintiffs' direct suit against Amerind under <u>Montana</u>.

BYE, Circuit Judge, dissenting.

I respectfully dissent from the holding as to the Tribal Court lacking jurisdiction over the three tribal members' direct suit against Amerind, a holding the majority justifies on the grounds Amerind is entitled to tribal immunity.

First, I believe Amerind waived its immunity in the contract between itself and the Turtle Mountain Housing Authority (TMHA). Second, even assuming Amerind did not waive its immunity, the procedural posture of this case demands us to allow the three tribal members an opportunity to conduct discovery to determine whether Amerind adopted a corporate resolution waiving its immunity, or otherwise waived its immunity with the requisite clarity by means of its conduct. Finally, I believe the result in this case is perverse. As a condition of receiving federal funds, Congress mandated tribes and tribal housing authorities be required to purchase insurance. As a practical matter, requiring the purchase of insurance is perhaps the consummate indication Congress intended tribes and tribal housing authorities would be subject to suit. The fact that we now recognize Amerind – the commercial entity created for the very purpose of fulfilling such Congressional mandate – to itself be immune from suit, may require the Supreme Court to re-examine the "wisdom of perpetuating the doctrine [of tribal immunity]." <u>Kiowa Tribe of Okla. v. Mfg. Techs., Inc.</u>, 523 U.S. 751, 758 (1998).

While I recognize a waiver of tribal immunity must either be "unequivocally expressed" by Congress, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978), or "waived, with the requisite clarity" by the tribe itself, C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411, 418 (2001), I believe the unique circumstances encountered in this case do indicate Amerind waived any tribal immunity it may have enjoyed.

The arbitration clause in the relevant insurance policy expressly states coverage disputes between Amerind and the TMHA were arbitrable "in the tribal jurisdiction in which the address shown in the Certificate of Coverage is located." The arbitration clause further provided local tribal laws were applicable, and an arbitrator's decision could be "appealed to a tribal court of competent jurisdiction." In C & L Enterprises, the Supreme Court held a tribe clearly waived its tribal immunity by entering into a contract containing an arbitration clause in which the tribe expressly agreed to arbitrate disputes arising under the contract and to allow an arbitration award to be enforced "in any court having jurisdiction thereof." 532 U.S. at 414. The Court explained it was resolving a conflict between "several state and federal courts [which] held that an arbitration clause, kin to the one now before us, expressly waives tribal immunity from *a suit arising out of the contract*" and some courts which held a tribe had not waived its immunity despite the presence of such a clause. Id. at 417-18 (emphasis added). In resolving the conflict, the Court cited with approval the following reasoning from the Supreme Court of Alaska:

> [W]e believe it is clear that *any dispute arising from a contract* cannot be resolved by arbitration, as specified in the contract, if one of the parties intends to assert the defense of sovereign immunity. . .. The arbitration clause . . . would be meaningless if it did not constitute a waiver of whatever immunity [the Tribe] possessed.

Id. at 422 (quoting Native Vill. of Eyak v. GC Contractors, 658 P.2d 756, 760 (Alaska 1983)) (emphasis added).

The Eighth Circuit had addressed this same issue prior to C & L Enterprises, also deciding a tribe clearly waived its immunity "with respect to claims under the contract" by entering into an agreement containing an arbitration clause, concluding "[b]y definition such disputes could not be resolved by arbitration if one party intended to assert sovereign immunity as a defense. . . . The parties clearly manifested their intent to resolve disputes by arbitration, and the Tribe waived its immunity *with respect to any disputes under the contract*." Rosebud Sioux Tribe v. Val-U Constr. Co. of S.D., Inc., 50 F.3d 560, 562-63 (8th Cir. 1995) (emphasis added).

Under Rosebud Sioux Tribe and C & L Enterprises, the arbitration clause in the insurance policy issued by Amerind clearly manifests Amerind's intent to waive immunity with respect to any disputes arising under the contract (i.e., coverage disputes) between itself and the TMHA.

The tribal court lawsuit did not, however, begin as a coverage dispute between Amerind and the TMHA; it was commenced as a wrongful death action filed by the three tribal members against the TMHA. Amerind was later added to the suit and, pursuant to tribal law, the suit became a direct action between Amerind and the three tribal members seeking insurance coverage up to the amount purchased by the TMHA. It was at that point Amerind sought to assert a sovereign immunity defense, which defense was rejected by the tribal court. Because the tribal lawsuit did not start as a coverage dispute between Amerind and the TMHA, but is now a coverage dispute, the question remains whether Amerind's clear waiver of immunity with respect to coverage disputes should apply. I believe, under the unique facts encountered in this case, such waiver still applies.

In addition to the arbitration clause, the policy also contained a clause stating the policy would conform to tribal law whenever the policy conflicted with such tribal law. As noted above, tribal law provides insurers of a tribal entity to be subject to direct actions when the tribal entity purchases the insurance pursuant to a mandate of federal law, and the federal law reflects an intent to provide remedies to third parties injured by the tribe. The policy's prohibition on direct actions against an insurer

(before the insured's obligation to pay is finally determined) conflicts with this principle of tribal law. Thus, the conforming clause applies. Amerind agreed the policy would conform to tribal law.

The result is this coverage dispute is being litigated directly between the tribal members and Amerind rather than between the TMHA and Amerind (or as a personal injury suit between the tribal members and the TMHA). In other words, Amerind's own contract operates in a manner in which coverage disputes may be resolved directly between itself and third party claimants, rather than between itself and the TMHA. This fact, coupled with Amerind's waiver of immunity "with respect to any disputes under the contract," Rosebud Sioux Tribe, 50 F.3d at 563, indicates Amerind waived its tribal immunity under the unique circumstances involved in this case.

II

Even assuming the arbitration clause does not operate as a clear waiver of immunity, I believe the procedural posture of this case requires us to remand it to allow the three tribal members to conduct jurisdictional discovery in the district court.

Amerind initiated this federal declaratory judgment action against the three tribal members and, as the majority acknowledges, voluntarily waived its tribal immunity in federal court by doing so. See Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1244-45 (8th Cir. 1995) (concluding a tribe waived its sovereign immunity by filing an action in federal court asking for something more than injunctive relief). Significantly absent from Amerind's complaint for declaratory relief is any claim whatsoever as to the tribal court lacking jurisdiction over Amerind because of tribal immunity. Such was not a ground upon which Amerind claimed a right to declaratory relief in federal court. In fact, Amerind *never* raised the issue of tribal immunity in the district court at any time between the filing of its complaint on September 4, 2007, and its notice of appeal to the Eighth Circuit on December 9, 2008.

-20-

The issue of tribal immunity was not raised in this federal action until October 13, 2009, when this court itself asked the parties to be prepared to address certain questions at the oral argument scheduled and held nine days later on October 22, 2009. Included among those questions were some pertaining to the issue of Amerind's immunity in tribal court. While some of our questions asked about the absence in the record of a corporate resolution waiving Amerind's immunity as to the three tribal members' suit, we never directly asked Amerind whether such a resolution had, in fact, ever been adopted.

In addressing our questions, Amerind renewed the unsuccessful argument it had pursued in tribal court, which was based on its current corporate charter's requirement that it must pass a resolution waiving immunity with respect to any particular lawsuit. The three tribal members responded by explaining the absence of a resolution under Amerind's current charter was irrelevant, because the current charter did not become effective until April 15, 2004, well after the operative events involved in this dispute.[11] The tribal members further argued, to the extent the *applicable* charter may be relevant, it was not part of this court's record, the district court's record, or the tribal court record. The tribal members argued Amerind should be deemed to have waived its immunity by abandoning the defense in the district court proceedings, thereby depriving the tribal members of the opportunity to conduct discovery and develop the factual predicate necessary to determine whether Amerind waived its immunity.

While I would decline the tribal members' request to find Amerind waived its immunity by failing to raise the issue in the district court, see, e.g., In re Prairie Island Dakota Sioux, 21 F.3d 302, 304 (8th Cir. 1994) (recognizing the jurisdictional nature

---

[11]The fire giving rise to the tribal court lawsuit occurred on October 19, 2002. The applicable insurance policy was in effect from January 1, 2002, through December 31, 2002. The three tribal members filed suit on January 23, 2003. Amerind was added to the lawsuit on September 5, 2003.

of tribal immunity); <u>Hagen v. Sisseton-Wahpeton Cmty. Coll.</u>, 205 F.3d 1040, 1044 (8th Cir. 2000) (allowing parties to raise tribal immunity for the first time on appeal), I nonetheless believe a remand is both necessary and appropriate.

As part of the grounds for concluding the tribal court lacked jurisdiction over Amerind in the tribal court, the majority relies upon the lack of evidence in the federal court record showing that Amerind's Board of Directors ever adopted a resolution waiving Amerind's immunity. However, the three tribal members never had a reason to look for that evidence (which may actually exist), because Amerind never raised the issue of immunity in the district court. Since Amerind was the party which failed to raise the issue in district court, it should not benefit from an incomplete factual record on the issue. Under these circumstances, the appropriate remedy should be to send this case back to the district court and allow the tribal members to conduct discovery. <u>See</u> <u>Miller v. First Serv. Corp.</u>, 84 F.2d 680, 683 (8th Cir. 1936) ("If . . . a grave doubt of jurisdiction arises, we may remand to the District Court for hearing and determination upon the question of jurisdiction."); <u>see also</u> <u>United States ex rel. Miss. Rd. Supply Co. v. H. R. Morgan, Inc.</u>, 528 F.2d 986, 987 (5th Cir. 1976) (indicating "it is vital to a proper determination of [a] jurisdictional issue for the record to be properly developed" and a remand is appropriate where the record is not properly developed).

III

Finally, I am compelled to comment on what I view as a perverse result. Amerind, a commercial entity created for the very purpose of insuring tribal entities, is permitted to rely upon tribal immunity as a ground for avoiding its contractual obligation to provide insurance coverage.

Indian housing authorities are required by federal law to carry liability insurance in order to receive grant money under the Native American Housing Assistance and Self-Determination Act (NAHASDA), 25 U.S.C. §§ 4101-4243.

Amerind is an insurance risk pool initially created by a collection of tribes at the encouragement of the United States Department of Housing and Urban Development (HUD) and subsequently issued a federal corporate charter pursuant to 25 U.S.C. § 477. Thus, Amerind's very creation and existence arises from the Congressional mandate which directs Indian tribes and tribal housing authorities protect themselves from tort liability (i.e., lawsuits) as a condition of their receipt of federal funds. It seems to me, therefore, that Congress necessarily envisioned the tribes and tribal housing authorities would be subject to suit, and by logical extension their insurer would likewise be subject to suit. If the insuring entity must itself consent to be sued before the insurance is operative, the condition Congress placed on the receipt of NAHASDA grant money seems tenuous at best, if not entirely illusory.

Prior to the Supreme Court's decision in Kiowa Tribe, some courts distinguished between the governmental functions of tribes and the commercial activities of tribal corporations when determining whether a particular tribal corporation was immune from suit. See, e.g., Dixon v. Picopa Constr. Co., 772 P.2d 1104, 1109-11 (Ariz. 1989) (rejecting a tribal construction corporation's claim of immunity in part because the corporation did not aid the tribe in carrying out tribal governmental functions), abrogated by Kiowa Tribe, as recognized in Cash Advance & Preferred Cash Loans v. State, 242 P.3d 1099, 1110 n.12 (Colo. 2010). One of the relevant factors in determining whether a commercial tribal corporation might enjoy the tribe's governmental immunity was whether the tribal corporation had purchased insurance coverage. See Dixon, 772 P.2d at 1110 ("The purchase of liability insurance is some evidence that the [Tribe] expected its corporation to be liable for its torts."). Here, the argument against extending tribal immunity to shield Amerind seems even stronger given the fact Amerind is actually an insurer and not just an insured.

While I acknowledge Kiowa Tribe renders irrelevant the distinction between governmental functions and commercial activities when determining whether a particular tribal entity enjoys immunity, I find it very significant the Supreme Court

-23-

did not address the distinction between tribal business corporations formed under 25 U.S.C. § 477 and tribal governments organized under 25 U.S.C. § 476. In this case, Amerind's corporate charter was issued pursuant to § 477, not § 476. There is some support for the argument that when Congress adopted the Indian Reorganization Act (IRA) in 1934, it did not intend tribal business corporations formed under § 477 to have the same immunity that tribal governments formed under § 476 would have. See Gaines v. Ski Apache, 8 F.3d 726, 729 (10th Cir. 1993) (recognizing the distinction between a tribe's governmental entity created under § 476 and a tribal business corporation formed under § 477); Veeder v. Omaha Tribe of Neb., 864 F. Supp. 889, 900 (N.D. Iowa 1994) (pre-Kiowa Tribe case noting decisions wherein courts held tribal corporations formed under § 477, as opposed to tribal governments organized under § 476, waived sovereign immunity); see also William V. Vetter, Doing Business with Indians and the Three "S"es: Secretarial Approval, Sovereign Immunity, and Subject Matter Jurisdiction, 36 Ariz. L. Rev. 169, 175 & n.35 (1994) (distinguishing between tribal governments formed under § 476 and tribal business corporations formed under § 477, and noting Congress added the latter section to the IRA "because of congressional concern that non-Indians would not do business with tribal governments that are immune from suit.") (citing Hearings on H.R. 7902, 73d Cong., 2d Sess. 90-100 (1934) and S. Rep. No. 1080, 73d Cong., 2d. Sess. (1934)). The argument against extending tribal immunity to a § 477 corporation seems particularly compelling when the commercial activity in which the corporation is engaged is providing insurance against tort liability, a purpose utterly at odds with the concept of immunity from suit.

In Kiowa Tribe, the Supreme Court questioned the "wisdom of perpetuating the doctrine [of tribal immunity]" noting it developed "almost by accident" and "with little analysis." 523 U.S. at 756-58. The Supreme Court suggested the continued recognition of tribal immunity may no longer be "necessary to protect nascent tribal governments from encroachments by States" and may "extend[] beyond what is needed to safeguard tribal self-governance" in our current commerce, where "[t]ribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians."

-24-

Id. at 758. The Court acknowledged that "[i]n this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims." Id. Ultimately, however, the Court "decline[d] to revisit [its] case law" and instead chose to "defer to the role Congress may wish to exercise in this important judgment [to abrogate the doctrine of tribal immunity]." Id. at 758, 760.

Where, as here, the already infirm concept of tribal immunity is extended so far as to shield a corporate entity whose very existence is at odds with the concept of immunity, it seems perhaps the time is now upon us to abrogate the doctrine.

IV

For the reasons expressed above, I respectfully dissent.

_____